**Affirmed and Memorandum Opinion filed September 27, 2012.**



In The

# Fourteenth Court of Appeals

_____

### NO. 14-12-00396-CV
_____

## IN THE INTEREST OF C.A.C., S.Y.C., K.G.C., AND M.E.C., CHILDREN

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2009-05044J**

## MEMORANDUM OPINION

The trial court signed a judgment on April 10, 2012, terminating Father's and Mother's parental rights to their four children. Father appeals the termination of his parental rights. We affirm.

### I. PROCEDURAL BACKGROUND

The procedural background of this case spans over three years. First, on June 17, 2009, the Department received a referral alleging neglectful supervision and physical

abuse of the children. At that time, the family was at a homeless shelter. On July 1, 2009, the Department filed an original petition for protection of the children, for conservatorship, and for termination in suit affecting the parent-child relationship. The trial court signed temporary orders naming the Department sole managing conservator of the children that same day. On July 14, 2009, after a full adversary hearing, the trial court signed temporary orders appointing the Department temporary managing conservator. On July 27, 2009, the children were placed in the home of Father's aunt. On August 18, 2009, the Department filed its service plans for Mother and Father with the trial court.

Approximately one year later, on June 22, 2010, the trial court signed a final decree in suit affecting the parent-child relationship. The trial court found that the appointment of Mother and Father as managing conservators would not be in the best interest of the children and, instead, appointed the Department sole managing conservator of the children. The trial court appointed Mother possessory conservator of the children, but did not appoint Father possessory conservator because it was not in the best interest of the children, and denied him possession of, or access to, the children. The children remained with Father's aunt.

A year later, in July 2011, the children were removed from the aunt's home because of domestic abuse between the aunt and the uncle, and were placed in a therapeutic foster home. On September 13, 2011, the Department filed an original motion to modify conservatorship and for termination of the parent-child relationship, seeking to (1) modify the June 22, 2010 final decree because circumstances had materially and substantially changed since the rendition of the prior final decree; and (2) to terminate Mother's and Father's parental rights. On March 22 and 26, 2012, the trial court held a bench trial on the Department's motion to modify. On April 10, 2012, the trial court signed an order modifying the prior order and entered a decree for termination. The trial court found that "[t]he circumstances of the Children or the Sole Managing

Conservator, Possessory Conservator, or other party affected by the prior order . . . dated June 22, 2010 have materially and substantially changed since the rendition of" that order. The trial court also found by clear and convincing evidence that termination of the parent-child relationship between the children and both Father and Mother would be in the children's best interest. The trial court further found that clear and convincing evidence supported termination of both Mother's and Father's parental rights under Sections 161.001(1)(E) and (P) of the Texas Family Code.[1]

## II. FACTUAL BACKGROUND

The four children involved in this parental rights termination case are a girl, C.A.C., who is the oldest, and three boys in descending order by age, S.Y.C., K.G.C., and M.E.C. When the children came into the care of the Department in July 2009, C.A.C. was 6 years old; S.Y.C. was almost 5; K.G.C. was 3½; and M.E.C. was a little over 2. At the time of trial in March 2012, C.A.C. was almost 9 years old; S.Y.C. was 7½; K.G.C. was a little over 6; and M.E.C. was 5.

### A. Evidence of Domestic Violence

The undisputed evidence at trial showed domestic violence between Father and Mother, though Father disputed the timing and quantity of the abuse. Specifically, Father testified that he takes responsibility for the domestic violence he committed between 2002 and 2005, but he claimed there was no domestic violence after K.G.C. was born in 2005. Father further claimed that he was not violent with Mother, or had an argument with Mother, in front of the children.

In contrast, Mother stated that Father beat her while she was pregnant with every child. According to Mother, there was domestic violence after K.G.C. was born in 2005. Mother testified that Father broke her nose, and had beaten her to the extent that she required hospital care.

---

[1] *See* TEX. FAM. CODE ANN. § 161.001(1)(E), (P) (West Supp. 2012).

3

Father denied that he broke Mother's nose, and claimed Mother had "never been in the hospital for any injury [he] gave her." Father claimed that he and Mother had one fight when she was pregnant with K.G.C., but he never beat her when she was pregnant. However, Father admitted that he hit Mother one time when she was pregnant. Father did not recall an occasion when the therapist threw him out of therapy because he became aggressive and violent during a session.

## B. Evidence of Mother's and Father's Drug Use/Abuse

With respect to his drug use, Father testified that he "probably smoked a joint every day," but he "wasn't a heavy drug user and [he] never did it around [his] kids." Father did not consider himself to be "a chronic marijuana user."

With respect to Mother, the evidence showed that she had used cocaine and amphetamines and that she had been a polysubstance abuser for thirteen years, since she was sixteen. Mother claimed that she never used drugs around her children, but admitted that she left the children in Father's care while she used drugs. At the time of trial, Mother was in a residential drug treatment program at the Cenikor treatment center. The children could not live with Mother at Cenikor. This was Mother's second time for treatment at Cenikor, and her fourth time in a drug treatment program. The Cenikor program lasts about eighteen to twenty-four months. However, Mother only stayed at Cenikor about six months the first time she was there. Mother was employed and had an apartment, but she had a relapse with drugs in 2011, testing positive for drugs in June, September, and November 2011. When Mother returned to Cenikor in October 2011, she was not employed and did not have an apartment.

Mother believed that she was recovering and would be able to care for her children. Judith Romo, Mother's counselor at Cenikor, stated that although Mother wants to care for her children, she is not ready for that yet, but Romo believed Mother could be a successful parent after completing the Cenikor program. At the time of trial,

4

Mother still had about a year and a half until she completed the Cenikor program, at which time Mother would be on her own in the community.

### C. Evidence of Father's Incarceration

In August, 2010, Father pleaded guilty to an April 14, 2010 offense of burglary of a habitation with intent to commit theft. On August 11, 2010, the court entered an order of deferred adjudication, placing Father on community supervision for that offense. On January 24, 2011, the State filed a motion to adjudicate Father's guilt for violating the terms and conditions of his community supervision by, among other things, testing positive for marijuana on November 18, 2010, and December 15, 2010, and failing to find suitable employment. On February 2, 2011, the trial court entered a judgment adjudicating Father's guilt and sentenced him to two years in prison. Father testified that his projected release date is September 29, 2012.

Although Father admitted that he violated the conditions of his community supervision, he claimed that he is incarcerated for a burglary he did not commit. Father stated that he had never been in jail for more than a week, and that he pleaded guilty to burglary because he wanted "to be released." Father testified that when he pleaded guilty to burglary of a habitation, he lied under oath.

### D. Evidence of the Children's Placement Since 2009

The evidence showed that the children's original placement with their Father's aunt was harmful to them because of the domestic violence they witnessed between the aunt and uncle and the abusive and neglectful treatment they received while living in the aunt's home. The children disclosed that there was "a lot of yelling and screaming" when the uncle lived with the aunt. The children "described the Uncle cursing at the Aunt." C.A.C. disclosed an incident when the police came to the aunt's home after the uncle had broken a window while they were fighting.

5

The children further described their treatment while living in the aunt's home. The children disclosed that they had to stay upstairs for long periods of time, and they were not permitted to go downstairs to use the bathroom. "The boys began to urinate in a green play dough bucket because they would get in trouble if they left the room and went downstairs." The children disclosed that the aunt had spanked all of them, and M.E.C. reported that the aunt had hit him with a belt, leaving marks on him.

Sarah Allen, the Department caseworker since June 2010, testified that the children were placed in a therapeutic foster home in July 2011 because of the domestic violence they witnessed between Mother and Father, the domestic violence they witnessed between their aunt and uncle, and the abuse and neglect they suffered while living in the aunt's home.

The evidence showed that S.Y.C., the second oldest child and the oldest boy, exhibited aggressive behavior. Amparo Makridis, the children's therapist since August 2011, testified that S.Y.C. was defiant; was not able to control his emotions; was disrespectful of authority figures at home and school; and had "temper outbursts that last[ed] for more than an hour." S.Y.C. also hit himself when he was angry, and there were occasions when Makridis and the foster mother had to restrain him because they were concerned he would hurt himself or someone else. Allen testified about an incident where S.Y.C. kicked a pregnant teacher at the daycare. S.Y.C. also flipped over desks when he did not like being told what to do.

Allen testified that S.Y.C. was more aggressive than he was before he was placed in the current foster home. Allen explained that as the children become older, they understand more of what is going on and become angrier about their situation. Allen stated that witnessing domestic violence creates a tendency in children to exhibit more violence. S.Y.C. witnessed a significant amount of domestic violence between his parents and between the aunt and uncle, which Allen believed was the cause of S.Y.C.'s aggressive behavior. However, S.Y.C. had shown improvement by the time of trial.

6

S.Y.C. was learning that his aggressive behavior was not appropriate and he showed remorse when he had done something wrong.

The evidence showed that K.G.C., the third oldest child and second oldest boy, also exhibited aggressive behavior. Initially, Allen did not see aggressive behavior in K.G.C. in June 2010. However, Allen stated that K.G.C. had become "a little more aggressive in his actions," and was on medications for his aggressiveness. According to Allen, K.G.C. sometimes understood that what he was doing was wrong, while at other times he did not. Makridis stated that K.G.C. was learning to express his emotions.

Makridis stated that M.E.C., the youngest child, had been least affected by his situation. Allen also testified that M.E.C. had not shown signs of aggressive behavior. Allen stated that M.E.C. had a "speech delay," such that he could hardly be understood. With speech therapy, M.E.C.'s speech had improved.

Allen described C.A.C. in 2010 as a "sweet bubbly, smiling" child, who was eager to please. Makridis similarly described C.A.C. as a child who wanted to please everyone, but was afraid of expressing her emotions and had difficulty remembering information. Allen stated that C.A.C. "[was] starting to show signs of anxiety" because of being in placement away from Mother. C.A.C. disclosed that she cried at night for Mother. Allen testified that it was reasonable for C.A.C. to miss her mother the most because she is the only girl. Also, C.A.C., who was five years old when she came into care, had the capacity to be attached to her mother. Allen also stated that C.A.C. had taken on the role of "little mama" with her younger brothers.

Makridis testified that all four children were making progress because they were in a good home with foster parents who were "very nurturing," and the children were happy in the foster home. Allen similarly testified that the children "had some major issues," but had improved due to the stability of the foster home. Allen also stated that the children loved the current foster home and were bonding with the foster parents.

7

Allen testified that it was in the children's best interest to terminate the parent-child relationship with both Mother and Father because the children had been in "limbo" and had lacked structure and stability. Allen stated that the children had structure and stability in the foster home. Allen explained that not terminating Father's and Mother's parental rights would be "detrimental" to the children because they were "building up more anxiety," and the "anxiety [was] just building up into aggressive behaviors" in the boys because they did not have any finality concerning their situation.

Lisa McCartney, who was retired after working for the Department for thirty years and was asked by the trial court to look at the case with the guardian ad litem, also explained that it was in the children's best interest to terminate the parental rights because they needed stability and permanency. McCartney warned that without a "permanent solution . . . these kids will be in the system until they are 18 years old." McCartney also explained that "they are identified in school as foster kids and that is anything but normal." The children receive clothing vouchers and have caseworkers visiting them. McCartney stated that "they just want to be like everyone else." Being in foster care impacts the children more as they become older. Allen testified that the Department had found an adoptive placement for C.A.C. with an extended family member of the foster parents. Allen also stated that the foster parents were thinking about adopting the three boys, but had not committed to adoption yet.

Allen further testified that the parents' rights should be terminated because of concerns about domestic violence between Father and Mother. Because Father was the primary perpetrator of the domestic violence in the home, Allen did not believe that "any placement that included [Father] would ever be a safe placement for the children" or that "it would ever be in their best interest to have continued contact with [Father]." Allen testified that the domestic violence made S.Y.C. more aggressive towards others. Allen also stated that the children had not asked for Father. McCartney similarly testified that the children did not "talk about [Father], except about him hitting their mother."

8

Allen explained that, at the original trial in this case in June 2010, the trial court decided to give Mother another chance; however, Mother had tested positive for drugs three times since June 2010. Allen believed that it was in the best interest of the children to have their safety and permanency guaranteed by termination of parental rights because Mother had taken a long time to try to get herself together.

Allen testified that the Department "had a chance" to seek termination of Father's parental rights in June 2010. It was hoped that Father "would get his act together," but the Department was "looking at reunifying, if ever, in the future with [Mother]." Allen explained that the Department might choose not to seek termination of parental rights of a parent who could provide financial support even though that parent could not have any contact with the children, which was a consideration of the Department in not terminating Father's parental rights at that time.

## III. ANALYSIS

In two issues on appeal, Father contends that (1) the trial court abused its discretion in finding a material and substantial change in circumstances; and (2) the evidence is legally and factually insufficient to support a finding that termination is in the children's best interest.

### A. Standard of Review

Involuntary termination of parental rights implicates fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980). The termination of the natural right between parents and children "is complete, final and irrevocable." *Id.* Therefore, termination proceedings are strictly scrutinized. *Id.*

Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by Section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and

9

convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 244; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. But we give due deference to the fact finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We then determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266.

### B.  Material and Substantial Change

In his first issue, Father asserts that the trial court abused its discretion in finding a material and substantial change in circumstances under Section 156.101 of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 156.101 (West Supp. 2012).

In its original motion to modify conservatorship and for termination of the parent-child relationship, the Department alleged that by "a *preponderance of evidence* that . . . the circumstances of the children, a conservator, or other party affected by the order have

10

materially and substantially changed since the date of the rendition of the order."[2]  After the Department rested at trial, Father moved for a directed verdict, arguing that there was no "material and substantial change of circumstances within the meaning of Texas Family Code 156.101(a)(1)."  The trial court denied Father's motion.

The April 10, 2012 order modifying a prior order states: "The circumstances of the Children or Sole Managing Conservator, Possessory Conservator, or other party affected by the prior order . . . have materially and substantially changed since the rendition of the order to be modified [and] that the appointment of [the Department] as Sole Managing Conservator would be a positive improvement for the children."

On appeal, Father again relies on section 156.101, entitled "Grounds for Modification of Order Establishing Conservatorship or Possession and Access."  Section 156.101(a)(1) provides:

> (a) The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child if modification would be in the best interest of the child and:
>
> (1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the earlier of:
>
> (A) the date of the rendition of the order; or
>
> (B) the date of the signing of a mediated or collaborative law settlement agreement on which the order is based[.]

TEX. FAM. CODE ANN. § 156.101(a)(1).

The Department responds that section 156.101 does not apply to a suit such as this, which seeks the termination of parental rights under Chapter 161, and does not seek to modify the conservatorship under Chapter 156.  The Department relies on *In re C.T.*, in which the court addressed the appellant's argument that evidence of abuse that

---

[2] Emphasis added.

occurred prior to the rendition of the last order affecting the parent-child relationship was not admissible in a Chapter 156 modification proceeding. *See In re C.T.*, No. 12-09-00401-CV, 2010 WL 4880631, at *4 (Tex. App.—Tyler Nov. 30, 2010, no pet.) (mem. op.). The Tyler Court of Appeals observed the distinction between section 156.101 modification proceedings and section 161.001 termination proceedings, which involve different issues and have different standards of proof. *Id.*

A section 156.101 modification proceeding determines whether the circumstances of the child or a conservator have materially and substantially changed since the date of the previous court order or mediated settlement agreement, and whether the modification is in the best interest of the child. *Id.* A trial court's modification of conservatorship is reviewed for an abuse of discretion. *Id.*[3] A section 161.001 termination proceeding determines whether the parent engaged in any one of the acts or omissions itemized in the first subsection of the statute, and whether termination is in best interest of the child. *Id.* Both elements for termination must be established by clear and convincing evidence. *Id.*[4]

Unlike the consequences of modification, the consequences of termination are permanent. *Id.* at *5. The court held that, because the case was a termination proceeding, not a modification proceeding, the trial court did not abuse its discretion in overruling the appellant's objections to evidence based on information, conduct, or acts that occurred before the prior order. *Id.*

---

[3] Section 105.005 of the Family Code states: "Except as otherwise provided by this title, the court's findings shall be based on a preponderance of the evidence." TEX. FAM. CODE ANN. § 105.005 (West 2008).

[4] The Texas Supreme Court has similarly observed the different standards of proof in the appointment of conservators and in termination of parental rights. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). "[T]he quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment." *Id.* Termination decisions must be supported by clear and convincing evidence because of due process concerns. *Id.* A finding that an appointment of a parent as managing conservator would significantly impair the child's physical health or emotional development is governed by the preponderance-of-the-evidence standard. *Id.* These differing standards of proof affect the method of appellate review, which is more stringent for termination decisions than for conservatorship decisions. *Id.*

12

The Department, however, points out that section 161.004 includes the requirement that there be a material and substantial change in the circumstances of the children or one of the parties since the rendition of the prior order that denied termination of parental rights, in addition to the two required elements found in section 161.001—that a predicate statutory ground for termination exists and that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. §§ 161.001, 161.004. Section 161.004, entitled "Termination of Parental Rights after Denial of Prior Petition to Terminate," provides:

> (a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:
>
> (1) the petition under this section is filed after the date the order denying termination was rendered;
>
> (2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;
>
> (3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and
>
> (4) termination is in the best interest of the child.
>
> (b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

TEX. FAM. CODE ANN. § 161.004 (West 2008).

The Department, nonetheless, posits that section 161.004's requirement of material and substantial change of circumstances is not applicable to this termination proceeding because "an express denial of termination" of Father's parental rights does not appear in the June 22, 2010 decree, and the testimony during trial indicates that the Department did not seek termination of parental rights at the time of the prior decree

13

because there was hope that the parents could rehabilitate.[5]   The Department acknowledges that the prior decree contained a Mother Hubbard clause stating "that all relief requested in this case and not expressly granted is denied," and that it could be argued that the prior decree denied the request for parental termination, making section 161.004 applicable.   The Department, however, contends that its claim for parental termination as to each parent was an alternative request for relief because such request was worded hypothetically—"[i]f reunification . . . cannot be achieved."

On this record, we hold that the prior decree operated to deny the Department's prior request to terminate Father's parental rights.[6]   Therefore, we address whether there has been a material and substantial change in the circumstances of the children or the parties under section 161.004.

There are no definite guidelines as to what constitutes a material and substantial change in circumstances under section 161.004.   *In re J.R.*, No. 07-12-00003-CV, 2012

---

[5] Allen's testimony at trial showed:

> A.  When the Agency was granted PMC [Permanent Managing Conservator] in June of 2010, we still had hoped that [Mother] would get her life together, do services, and ultimately regain custody of the children.

> Q.  Did you have a chance to terminate the father's rights or ask for termination at that time?

> A.  Yes, we had a chance.

> Q. Was it also your home that he would get his act together?

> A.  Yes, it was a hope, but we were looking at reunifying, if ever, in the future with [Mother].

[6] *See In re M.F.*, No. 11-08-00276-CV, 2010 WL 1948625, at *1–2 (Tex. App.—Eastland May 13, 2010, no pet.) (mem. op.) (finding that section 161.004 was applicable where the trial court had entered prior order naming the paternal aunt and uncle as permanent managing conservators and the parents as possessory conservators because, although there was not a previous order denying termination of parental rights, there was an agreed final order in response to a petition to terminate parental rights).

WL 1605738, at *3 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (citing *In re N.R.T.*, 338 S.W.3d 667, 678–79 (Tex. App.—Amarillo 2011, no pet.)).[7]

Father argues that *his* circumstances have not materially and substantially changed despite his current confinement.[8]  Father's primary argument is that his incarceration is not a material and substantial change because it was anticipated at the time of the June 22, 2010 decree.  Father further contends that, because he was not named a possessory conservator in the prior June 22, 2010 decree, his incarceration, even if not an anticipated circumstance at the time of that decree, would not be a material and substantial change.  Father avers that upon release he would be available to do a family service plan and work towards having the children returned to him.

Contrary to Father's contention, the adjudication of Father's guilt and imposition of a two-year prison sentence since the June 2010 decree is a material and substantial change in circumstances.  *See In re B.L.H.*, No. 01-06-00817-CV, 2008 WL 864072, at *6 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (mem. op.) (holding that the trial court could have concluded that the appellant's return to jail, whether on a probation violation or a new offense, was a material and substantial change in circumstances).

Moreover, a material and substantial change in circumstances is not limited to Father's circumstances as he seems to suggest.  Here, the trial court could also find the requisite material and substantial change in the circumstances of Mother or the children.  As the Department points out, the request to terminate Father's parental rights was the second alternative originally proposed—subordinate to Mother's rehabilitation and the family being reunited.  However, Mother failed three drug tests after rendition of the June 2010 decree and was in drug treatment for the fourth time at the time of trial, with

---

[7] Section 161.004 is often addressed in the context of the parents' raising res judicata in a termination proceeding or arguing that it should have been raised.  *In re K.G.*, 350 S.W.3d 338, 349 (Tex. App.—Fort Worth 2011, pet. denied).  There is also a split of authority on whether the trial court's prior order has to be final before section 161.004 can be used.  *Id.* at 349 n.18.

[8] Although Father specifically relies on section 156.101, we address whether there has been a material and substantial change in circumstances under section 161.004.

15

another year and a half left in the residential treatment program at Cenikor. *See Thompson v. Tex. Dep't of Family & Protective Servs.*, 176 S.W.3d 121, 126 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (observing that the mother had been unable to follow the service plan, her rights had been terminated, and the appellant was in prison unable to care for the child; therefore the mother's changed circumstances were relevant to the child's circumstances "because there is now no possibility of the child and both parents being reunited in a suitable home"), *overruled on other grounds by Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Furthermore, the children were removed from the aunt's home in July 2011 because of domestic violence, and it was later disclosed that the children were subject to abuse and neglect in the aunt's home. Although the evidence showed that the children were improving, happy in the foster home, and bonding with the foster parents, the children were also showing signs of anxiety from the lack of stability and permanence. An adoptive home had been found for C.A.C. with the relative of the foster parents, and the foster parents were considering adopting the three boys but had not made any commitment. *See In re J.R.*, 2012 WL 1605738, at *4 (observing that the children, who were in foster homes, were "significantly closer, both psychologically and logistically, to places in which they seek adoptive families and stability," thereby supporting a finding of material and substantial change in circumstances); *Thompson*, 176 S.W.3d at 126 (holding that child's progress in foster care was a change in circumstances because it "ha[d] readied him for a more permanent placement").

We conclude that the trial court could have formed a firm belief or conviction that there has been a material and substantial change in the circumstances of Father, Mother, and the children since the rendition of the June 22, 2010 decree. We overrule Father's first issue.

## C. Best Interest

In his second issue, Father asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the best interest of the children. In support of this issue, Father relies on his testimony that his mother supports his efforts to get back his children and that he loves his children "with all his heart." Father claimed at trial that he is "completely clean and sober" and he is "fully committed to [his] children."

There is a strong presumption that the best interest of the child is served by keeping the child with the natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The Department has the burden to rebut this presumption. *In re U.P.*, 105 S.W.3d at 230.

In determining whether termination is in the best interest of the child, we may consider (1) the child's desires; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the person seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive, nor must all the factors be proved as a condition precedent to terminate parental rights. *In re C.H.*, 89 S.W.3d at 27. "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.*

17

Evidence supporting termination under one of the grounds listed in section 161.001(1) may support a finding that termination is in the best interest of the children. *See id.* ("While it is true that proof of acts or omissions under section 161.001(1) does not relieve the petitioner from proving the best interest of the child, the same evidence may be probative of both issues."). The trial court found by clear and convincing evidence that Father had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children under section 161.001(1)(E). Father does not challenge trial court's findings of termination under section 161.001(1)(E).

Under subsection E, the cause of the endangerment must be the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). It is not necessary that the parent's conduct be directed at the child or that the child actually is injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger of which the parent is aware but disregards. *Id.* Father admitted that there was domestic violence from 2002 to until 2005, when K.G.C. was born. Father denied that he ever beat Mother when she was pregnant, with the exception of one time, or that he broke her nose or injured her badly enough that she required treatment at a hospital. However, Mother testified that Father beat her when she was pregnant with every child, broke her nose, and injured her to the extent that she sought treatment at a hospital. Acts of endangerment that precede the child's birth may be considered. *In re J.I.T.P.*, 99 S.W.3d 841, 844 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Abusive or violent conduct can produce a home environment that endangers a child's well-being. *Id.* at 845. "Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment." *Id.* Thus, evidence of domestic violence between Mother and Father supports a finding of endangerment to the physical or emotional well-being to the children.

18

Father also admitted that he "probably smoked a joint every day," although he claimed that "[he] never did it around [his] kids," and he did not consider himself to be "a heavy drug user." It is well settled that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345; *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("Drug use and its effect on a parent's ability to parent may establish an endangering course of conduct."); *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (explaining that use of narcotics, in some circumstances, may support termination under section 161.001(1)(E), and evidence of narcotics use and its effect on a parent's life and the ability to parent may establish that the parent has engaged in an endangering course of conduct); *In re U.P.*, 105 S.W.3d at 233 ("Endangerment may include evidence of drug addiction and its effect on a parent's life and his ability to parent.").

The evidence shows that Father is unable to provide for the present and future physical and emotional needs of children because of the domestic violence, his drug use, the children having lived in a homeless shelter, and his incarceration.[9] "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, no pet.) (mem. op.). Father's conduct also put the children in emotional and physical danger, and it indicates that the parental-child relationship with each child was not appropriate. Finally, the Department intended to find permanent homes for the children. At the time of trial, an adoptive home had been

---

[9] Father admitted that he had a "pretty bad" gambling addiction, but he claimed the he took care of his children in spite of it. Although Father testified that he has work experience in call centers, collections, corporate sales, and human resources, he also admitted that he did not realize how difficult it would be to obtain employment if convicted. Father stated they went to the homeless shelter when he originally lost his job. Father conceded he had not paid any support since June 2010. At the March 2012 hearing, Father agreed that he was not projected to be released from jail until September 2012. Moreover, Father testified that he believes his aunt took "good care" of his children, notwithstanding the fact that Fort Bend County had initiated an investigation into alleged abuse.

19

identified for C.A.C., and the foster parents were considering adopting the boys. Father did not provide a plan for his children beyond his statement that he loves them and his mother supports him getting his children back.[10]

For cases in which the Department or another government agency is the petitioner, Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West 2008). Section 263.307(b) lists the factors to consider in determining whether a parent is "willing to provide the child with a safe environment." Id. § 263.307(b). Those factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family

---

[10] Moreover, Allen testified that it would be in the children's best interest to terminate Mother's and Father's parental rights because the children had lacked stability and structure with their parents. McCartney also explained that termination of parental right was in the children's best interest because the children needed permanency, and adoptive homes needed to be identified sooner rather than later. At the time of trial, the children had been the Department's care for nearly three years. Finally, the evidence showed that the children did not ask about Father.

demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child.  *Id.*

The first, seventh, eighth, ninth, and twelfth statutory factors are relevant to the best-interest inquiry in this case.  All four children are young.  The oldest child was almost nine at the time of trial.  The children are, therefore, completely dependent on adults for their care.  The evidence showed an extensive amount of domestic violence, including while Mother was pregnant with each child.  Father admitted to smoking marijuana every day.

We conclude that the trial court could have formed a firm belief or conviction that termination of Father's rights to C.A.C., S.Y.C., K.G.C., and M.E.C. was in the children's best interest.  We overrule Father's second issue.

Having overruled both of Father's issues on appeal, we affirm the trial court's judgment.


/s/    Sharon McCally
        Justice

Panel consists of Justices Frost, McCally, and Busby.

21